UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                 :

ALVIN PETERSON,                  :        02 Civ. 6325 (RJH)
                                 :

              Plaintiff,     :

                                 :        **MEMORANDUM**
        - against -         :  **OPINION AND ORDER**
                                 :

ALAN TOMASELLI, et al.,       :
                                 :

              Defendants.   :
                                 :
------------------------------------------------------------x

       Plaintiff Alvin Peterson brings suit under 42 U.S.C. § 1983 against former

Assistant District Attorney Alan Tomaselli ("Tomaselli"), the City of New York, the

Commissioner of the New York City Department of Corrections ("Commissioner"), and

other unnamed defendants (collectively "defendants").  Plaintiff alleges defendants

violated his rights under the Fourth, Eighth, and Fourteenth Amendments through actions

resulting in his incarceration in a state penitentiary lasting eight-and-a-half months longer

than legally prescribed.  Plaintiff separately asserts that Tomaselli and the City of New

York violated New York Judiciary Law § 487 (McKinney 2005).  Defendants move for

summary judgment under Rule 56 of the Federal Rules of Civil Procedure against

plaintiff's complaint in its entirety.  For the reasons stated below, defendants' motion

[58] is granted.

**BACKGROUND**

The following facts are derived from defendants' Rule 56.1 Statement of Facts,[1] plaintiff's amended complaint and affirmation, as well as three preceding opinions decided by Judge Robert R. Patterson, *Peterson v. Lacy*, No. 97 Civ. 7795 (RPP) (KNF), 1998 U.S. Dist. LEXIS 19599, 1998 WL 883302 (S.D.N.Y. Dec. 17, 1998) ("*Peterson I*"), Judge Denny Chin, *Peterson v. Tomaselli*, No. 02 Civ. 6325 (DC), 2003 U.S. Dist. LEXIS 17006, 2003 WL 22213125 (S.D.N.Y. Sept. 29, 2003) ("*Peterson II*"), and this Court, *Peterson v. Tomaselli*, No. 02 Civ. 6325 (RJH), 2004 U.S. Dist. LEXIS 19765, 2004 WL 2211651 (S.D.N.Y. Sept. 30, 2004) ("*Peterson III*").  Because the facts are complicated, and have been previously set forth only when this proceeding was at the motion to dismiss stage, this Court will endeavor to lay them out again in chronological order.  The facts are undisputed except where indicated.

On August 7, 1993, plaintiff was arrested and charged with criminal sale and possession of a controlled substance in the third degree by the Office of the Special Narcotics Prosecutor ("OSNP").  (Am. Compl. ¶ A.)  Peterson was then on federal parole for a separate offense, and this criminal activity violated the terms of his parole. *Peterson II*, 2003 WL 22213125, at *1.  On April 4, 1994, plaintiff plead guilty to the state charge with the understanding that he would be sentenced to three-and-a-half to seven years to run concurrently with the federal sentence he would serve upon revocation of parole.  (Am. Compl. ¶ A.)  Procedurally, it was contemplated that plaintiff would be

---

[1] Plaintiff failed to submit his own Rule 56.1 Statement of Facts or contest defendants' Rule 56.1 Statement.  Under Rule 56.1(c) of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).  Therefore, the facts asserted in defendants' Rule 56.1 Statement are deemed admitted to the extent they are supported by admissible evidence.

transferred to federal custody to be sentenced for parole violation and then returned to state custody to permit the imposition of the concurrent state sentence.

As of June 28, 1994, prosecutors had still not determined the proper procedural steps thought necessary to give effect to the plea agreement. *Peterson III*, 2004 WL 2211651, at *1. On that date, plaintiff moved to withdraw his plea. (Smith Decl. Ex. B ¶ 9.) Justice Felice K. Shea of the New York Supreme Court denied the motion and sentenced plaintiff to three-and-a-half to seven years, to run concurrently with the federal sentence to be imposed for his parole violation. (*Id.* ¶ 10.) Justice Shea ordered plaintiff to be paroled to federal custody so that he could be sentenced for his parole violation. (*Id.*) Thus began what Judge Patterson referred to as a "Kafkaesque comedy of errors." *Peterson I*, 1998 WL 883302, at *1. In disregard of Justice Shea's order and subsequent orders on July 12 and 21, 1994, the New York City Department of Corrections ("NYC DOC") failed to turn plaintiff over to federal authorities for sentencing. *Id.* On July 19, 1994, plaintiff was instead transferred by NYC DOC to the New York State Department of Correctional Services ("NYS DOCS") to begin serving his state sentence without having been sentenced for his federal parole violations. (Smith Decl. Ex. B ¶ 12.) Plaintiff alleges that prior to being sent to state prison, he attempted to have his "dorm officer" inform "State screening officials" that he was to be taken into federal custody. The unidentified officials allegedly told the "dorm officer" that plaintiff "doesn't have a concurrent sentence, . . . he's going upstate." (*Id.* ¶ 10.)

On September 2, 1994, plaintiff moved the New York Supreme Court for an order vacating his sentence on the grounds that the concurrent sentencing provided for in the plea agreement had not been effected and that he would in fact be serving consecutive

sentences.  (Fischer Aff. Ex. A.)  In an affirmation submitted on September 14, 1994,

Peterson's counsel advised the Court that, based on his discussions with NYC DOCS, the

proper procedure to effect the plea agreement was (1) to vacate the existing state

sentence, (2) to release Peterson to federal custody, and (3) after completion of his federal

sentence, to return him to state court to receive a concurrent sentence.  (*Id.*, Ex. B at 3.)

On October 24, 1994, Justice Shea granted the unopposed motion, vacated plaintiff's

sentence, and directed that defendant be released to federal custody.  (Smith Decl. Ex. E.)

The October 24 order further directed NYC DOC to file a detainer with the federal

authorities so that plaintiff could be returned to state court and resentenced, concurrently,

as soon as he had been sentenced for his parole violation.  This was somewhat different

than the procedure proposed by Peterson's counsel who requested that Peterson not be

resentenced until *after* he completed his federal sentence.

Plaintiff was in fact released to federal custody at the Federal Correctional

Institution in Ray Brook in New Jersey on January 4, 1995.  (Smith Decl. Ex. B ¶ 17.)

On January 6, 1995, Peterson's counsel and Assistant District Attorney ("ADA")

Frederica Miller entered into a stipulation confirming that, following his federal parole

violation hearing, he would be returned to state court for imposition of a concurrent

three-and-a-half year sentence.  (Fischer Aff. Ex. E.)  In August 1995, plaintiff's federal

parole was revoked by the Board of Parole Examiners for violation of its terms and he

was ordered to serve the remaining term of incarceration under his prior sentence at the

Federal Correctional Institution in Fairton ("FCI Fairton").  *Peterson I*, 1998 WL 883302,

at *2.  Thereafter, plaintiff notified his attorney that he had been sentenced for his federal

parole violation and asked to be produced in state court for sentencing in accordance with

his plea agreement.  (Smith Decl. Ex. B ¶ 18.)  On October 10, 1995, ADA Miller lodged

a detainer with the Federal Bureau of Prisons requesting plaintiff be returned to state

custody for sentencing *after* he completed his federal sentence.  (Pet. Ex. 3.)  This letter

was inconsistent with Justice Shea's October 24, 1994 order as well as the January 6,

1995 stipulation, pursuant to which plaintiff was to be returned to state custody for

sentencing after the federal parole hearing.  He was not transferred.

On November 15, 1995, plaintiff requested final disposition of his state charge

under the Interstate Agreement on Detainers ("IAD"), apparently in order to have himself

returned to state court for sentencing.  *Peterson I*, 1998 WL 883302, at *2.  The IAD

requires states to hold a trial within 180 days on any untried indictments, complaints, or

information for which a detainer was lodged.  *Id.* at *2 n.5.  Plaintiff alleges that on

March 21, 1996, the Federal Bureau of Prisons notified state authorities that no action

had been taken to seek plaintiff's appearance in state court as mandated by the IAD and

that the 180-day time limit would expire on May 17, 1996.  (Petition, Ex. 4.)  After 180

days had elapsed, plaintiff moved, in June 1996, to dismiss his state charge, claiming that

because the state failed to satisfy the requirements of the IAD, his state statutory right to

a speedy trial had been violated.  *Peterson I*, 1998 WL 883302, at *3.

On July 1, 1996, Olga Sakelos, an Extradition Specialist at the OSNP, advised

FCI Fairton that the OSNP was lifting all detainers against Peterson and would not

extradite him.  (Smith Decl. Ex L.)  Plaintiff alleges that this letter was sent in response to

the earlier letter from the Federal Bureau of Prisons concerning the IAD.  (Smith Decl.

Ex. B ¶ 23.)  Plaintiff further alleges that this letter was sent at the behest of Tomaselli,

an assistant district attorney, Bronx County and a division chief at the OSNP, but has

produced no evidence to support his allegation.  (*Id.*)  Tomaselli's name appears nowhere on the letter (Smith Decl. Ex L.), nor was he part of the OSNP's extradition unit. (Tomaselli Dep. 9:24–10:1).

On August 16, 1996, defendant Tomaselli appeared in the ongoing state action and filed papers in opposition to Peterson's June 1996 motion to dismiss his state charge. (Smith Decl. Ex. F.)  On August 21, 1996, Tomaselli submitted an affirmation to state court requesting issuance of an order directing the Federal Bureau of Prisons to turn plaintiff over to state custody so that he could be sentenced.  (Jakabovics Decl. Ex. C.)  It is not clear precisely when Peterson was transferred to state custody, but he was present in court for a hearing on October 4, 1996 on his motion to dismiss.  (Smith Decl. Ex. K.) Justice Shea denied plaintiff's motion on the basis that the IAD applied only to untried indictments whereas Peterson had already plead guilty to an indictment.  (Smith Decl. Ex. F at 5–6); *Peterson I*, 1998 WL 883302, at *3.  However, in his reply papers, Peterson had raised a new claim that the delay in the imposition of his state sentence deprived him of his right to appeal and violated his due process and Eighth Amendment rights. *Peterson I*, 1998 WL 883302, at *3; (Smith Decl. Ex. K at 2–3.)  Justice Shea directed the state to respond to these new arguments, and, on October 31, 1996, Tomaselli submitted supplemental opposition papers.  (Jakabovics Decl. Ex. D.)  In his affirmation, Tomaselli contended that dismissal was unwarranted since Peterson would suffer no prejudice from any sentencing delay since his eventual state sentence "will be running concurrent with his Federal sentence, on a *nunc pro tunc* basis."  (*Id.*)  Tomaselli noted that Peterson "has been in custody with the Court's assurance that he will be getting credit for this [federal] time when his state sentence is imposed."  (*Id.*)  Justice Shea

denied plaintiff's motion on November 22, 1996, specifically noting that Peterson "will be getting credit for time served in Federal custody when his state sentence is imposed." *Peterson I*, 1998 WL 883302, at *3.

Prior to the November 22, 1996 hearing on Peterson's motion, Justice Shea had ordered that plaintiff be returned to federal custody. This was done at Peterson's request so that he could continue to receive treatment for an ongoing medical problem. (Smith Decl. Ex. K 3:19–4:2.) In compliance with the court's order, Tomaselli submitted an affirmation dated October 17, 1996 requesting the court to issue an order directing NYC DOC to release plaintiff to federal custody. (Smith Decl. Ex. I.) The affirmation stated that plaintiff was sentenced in state court to three-and-a-half to seven years. This statement was literally true but unfortunately did not reveal that this sentence had subsequently been vacated. Defendant Tomaselli has testified that although he signed the affirmation, he did not prepare it, and further that it was prepared by the office's extradition unit based on information of the unit's contemporaneous files. (56.1 Statement ¶¶ 20, 22.) The extradition unit's computerized files do not show that Peterson's 1994 sentence had been vacated. (Smith Decl. Ex. G.)

The record at this point becomes unclear. It appears that plaintiff became aware of Tomaselli's affirmation and informed the records coordinator at FCI Fairton that the statement concerning his sentence was false. He alleges that Tomaselli conspired with Eleanor Dunnigan, a NYS DOCS Inmates Records Coordinator, to have her forward "false documents" to FCI Fairton to support his affirmation. (Am. Compl. ¶ 28.) This apparently refers to the December 9, 1996 letter sent by Dunnigan to FCI Fairton stating that a certified copy of plaintiff's "concurrent New York State commitment" was

enclosed and requesting that it be lodged as a detainer against plaintiff.  (Smith Dec. Ex. J.)  Tomaselli claims he has never spoken to Dunnigan.  (Tomaselli Dep. 13:10–13.)

On January 2, 1997, R.M. Booher, the Inmate Systems Manager at FCI Fairton, sent a letter to Tomaselli informing him that he had not "received a copy of the judgment the NYDOC referred to."  (Jakabovics Decl. Ex. F.)  Evidently, Dunnigan's letter had not enclosed a certified copy of plaintiff's judgment as stated.  The Booher letter further stated that the extradition unit of OSNP had advised FCI Fairton that a bench warrant had been issued in the case.  However, because Booher could not confirm plaintiff's state sentence or warrant, he removed the detainer against plaintiff awaiting receipt of a "certified copy of a pending warrant, information, complaint, or judgment."  (*Id.*)

On January 6, 1997, Olga Sakelos sent another letter to FCI Fairton stating that she was faxing a detainer letter along with a certified copy of plaintiff's bench warrant.  (Jakabovics Decl. Ex. G.)  Sakelos's letter further stated that "[w]e are anxious to obtain the return of this defendant back to our jurisdiction for sentencing."  Plaintiff alleges this letter was sent at the behest of Tomaselli.  (Am. Compl. ¶ 3.)  He also alleges that Tomaselli requested the aforementioned bench warrant and that it was issued for a violation of state parole, despite the fact that plaintiff was never on state parole.  (*Id.*)  However, plaintiff offers no evidence, nor does there appear to be any in the record, to support either of these allegations.

On January 29, 1997, plaintiff was released into state custody.  (Smith Decl. Ex. B ¶ 32.)  Several weeks later, he was finally sentenced in state court to a term of three-and-a-half to seven years to run concurrently with his federal sentence.  *Peterson I*, 1998 WL 883302, at *3.  Judgment was entered on February 28, 1997.  *Id.*  However, because

plaintiff had already completed his federal sentence, it appears that the judgment and commitment papers should have stated that the state sentence was being imposed on a *nunc pro tunc* basis, or, in some other manner, explicitly stated that Peterson was to be credited by NYS DOCS for the twenty-four months of federal incarceration previously served.  As noted, this was the express intention of Justice Shea stated at the hearing of November 22, 1996.  According to plaintiff, he asked his counsel to explicitly request that Justice Shea impose sentence *nunc pro tunc* but that counsel did not believe it was necessary to do so.  (Peterson Dep. at 58–60.)

NYS DOCS thereafter computed Peterson's automatic conditional release date to be May 7, 2000.  *Peterson I*, 1998 WL 883302, at *5.  Had he been given credit for his federal sentence as provided by the plea agreement and intended by the parties and the Court, his conditional release date would have been April 12, 1998.  Subsequently, plaintiff filed a motion to have the state court revisit his sentence and vacate the judgment, and made a motion for leave to appeal to the Appellate division.  *Peterson I*, 1998 WL 883302, at *3–*4.  He restated his earlier claim based on the IAD and argued that the NYS DOCS incorrectly refused to credit the time he had already served in federal prison against the state sentence.  On November 26, 1997, the court denied his motion, holding that his request that the NYS DOCS credit him for time served in federal prison "cannot be raised in the instant action."  *Id.* at *4.[2]

Plaintiff continued to seek dismissal of his indictment, credit for time served, or release from prison by filing an appeal with the Appellate Division upon being granted

---

[2] The proper means for contesting the calculation of a release date is to file an Article 78 proceeding in New York state court against NYS DOCS for recalculation of prisoner's sentence.  *See, e.g., Soriano v. N.Y. State Dep't of Corr. Servs.*, 801 N.Y.S.2d 847 (N.Y. App. Div. 2005); *Thorpe v. N.Y. State Dep't of Corr. Servs.*, 761 N.Y.S.2d 880 (N.Y. App. Div. 2003).

leave and filing a habeas petition in this court.  On December 17, 1998, Judge Patterson granted plaintiff's habeas petition.  *See Peterson I*, 1998 WL 883302.  Judge Patterson ordered a writ of habeas corpus issue and that plaintiff be immediately released unless there was evidence that his conditional release date had been pushed back due to a loss of his good time credit.  *Id.* at *10.  Judge Patterson found that plaintiff's automatic conditional release date (with good time credit) was April 12, 1998.  *Id.* at *5.  He further found that the delay in sentencing of more than three-and-a-half years and a delay in appeal of almost two years deprived Peterson of "the conditional release which his agreed upon sentence would have afforded him eight months ago."  *Id.* at *8.

Days before plaintiff's habeas petition was granted, plaintiff's new state counsel and ADA Tomaselli entered into a stipulation to correct the sentence imposed by Justice Shea to explicitly state that, consistent with the intent of the parties, the sentence was imposed *nunc pro tunc* as of plaintiff's first day in federal prison and that plaintiff would be credited with the time served under his federal sentence.  (Letter of Ass't Att'y General Efrem Z. Fischer to Judge Patterson, December 21, 1998, Ex. C.)  Pursuant to the stipulation, plaintiff was released from state prison on December 16, 1998.  (*Id.*, Ex. E.)  At this point, however, plaintiff had been imprisoned by New York approximately eight months beyond the conditional release date that would have applied had NYS DOCS, at the time plaintiff was resentenced by Justice Shea in February 1997, properly credited plaintiff for federal time served.

Thereafter, plaintiff filed this § 1983 action in front of Judge Chin on August 8, 2002, seeking damages against Dunnigan and Tomaselli, and later moved to amend the complaint to add NYC DOC and OSNP.  *Peterson II*, 2003 WL 22213125, at *1, *4.  In

his opinion, Judge Chin dismissed the claim as against Dunnigan and granted plaintiff leave to amend. *Id.* at *8–*9. The action was then transferred to this Court. Defendants moved to dismiss the complaint in its entirety and plaintiff cross-moved for leave to amend his complaint and for summary judgment as to some of the claims. *Peterson III*, 2004 WL 2211651, at *1. This Court granted defendants' motion to dismiss the claims against NYC DOC and OSNP on the grounds they were not suable entities, but allowed plaintiff to amend the complaint to add unidentified employees of those agencies and the Commissioner of the NYC DOC. *Id.* at *5, *8. Plaintiff was denied leave to add the City of New York as defendant without prejudice to his right to file a renewed motion to amend based on specific allegations sufficient to state a § 1983 claim against the City. *Id.* at *11. Finally, plaintiff was denied leave to amend his complaint to add conspiracy claims against various defendants, again without prejudice to a renewed motion to amend based on proper factual allegations. *Id.* at *14. On May 17, 2005, plaintiff filed an amended complaint. In disregard of the Court's direction, plaintiff added the City of New York as a defendant without seeking leave to do so. (Am. Compl. ¶ 2.) After discovery was completed, defendants filed this motion for summary judgment on April 18, 2006.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323–25 (1986).  In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor.  *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party can satisfy its burden by showing that the opposing party is unable to establish an element essential to that party's case and on which that party would bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 321; *Gallo v. Prudential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) (A "moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case."  *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998).

If the moving party meets its burden, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial."  *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23.  An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson,* 477 U.S. at 247–48.  Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures, or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.  *See id.* at 256–57; *Gross v. NBC*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

**DISCUSSION**

Defendant Tomaselli moves for summary judgment dismissing the complaint, arguing that the evidence adduced in discovery fails to establish a claim for violation of plaintiff's constitutional rights under the Fourth, Eighth, and Fourteenth amendments. Rather than claiming plaintiff has suffered no constitutional wrong, Tomaselli argues that he was not the cause of any such injury. Tomaselli also raises several defenses in his answer and in this motion. First, Tomaselli asserts that all claims against him in his official capacity are barred by the Eleventh Amendment. Second, Tomaselli asserts absolute immunity for all his actions, or in the alternative, qualified immunity. Finally, Tomaselli and the City of New York argue that plaintiff's state law claims are barred by plaintiff's failure to comply with notice of claim requirements. Defendant City of New York moves for summary judgment on the grounds that there is no evidence to support plaintiff's claim of municipal liability. Before addressing Tomaselli's substantive causation argument, the Court will first consider preliminary issues raised by Tomaselli regarding his liability.

**1.    <u>Claims Against Alan Tomaselli</u>**

Plaintiff files suit against Tomaselli in both his official and personal capacity. (Am. Compl. ¶ 18.) Tomaselli argues that the Eleventh Amendment bars suit against him in his official capacity and that absolute immunity, or in the alternative qualified immunity, bars suit against him in his personal capacity.

a.    *Eleventh Amendment*

The Eleventh Amendment bars federal courts from entertaining suits brought by private parties against a state in its own name. *See Edelman v. Jordan*, 415 U.S. 651,

662–63 (1974).  This sovereign immunity has been extended to actions against state officials sued for damages in their official capacity, as payment would come out of the state treasury.  *See Ford Motor Co. v. Dep't of Treasury,* 323 U.S. 459, 462 (1945). Thus, suit against Tomaselli in his official capacity seeking damages is barred by the Eleventh Amendment if he is considered a state official.

The Second Circuit has had an opportunity to address whether a county district attorney is a state official.  *See Myers v. County of Orange*, 157 F.3d 66 (2d Cir. 1998). Therein, the court held that "[u]nder New York law, DAs and ADAs are generally presumed to be local county officers, not state officers." *Id.* at 76.  District attorneys have been expressly so categorized when engaged in "administration of the district attorney's office," *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993), or acting as a "manager" of the district attorney's office, *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992).  However, the Second Circuit recognizes a narrow exception under New York law when the prosecutor is making an individual decision whether to prosecute.  *Myers*, 157 F.3d at 77; *Ying Jing Gan*, 996 F.2d at 536 (district court decision that district attorney represented the state "was correct to the extent that the complaint attacked a decision as to whether or not to prosecute"); *Baez v. Hennesey*, 853 F.2d 73, 77 (2d Cir. 1988) ("[W]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.").

Plaintiff alleges several distinct acts by Tomaselli that caused his injuries: (1) directing Olga Sakelos to forward a July 1, 1996 letter to FCI Fairton stating that the OSNP would not extradite Peterson and that it was lifting all detainers against him; (2)

14

submitting an affirmation on October 17, 1996 requesting that the New York Supreme Court order plaintiff's release to federal custody and incorrectly stating that plaintiff had been sentenced in state court; (3) conspiring with Eleanor Dunnigan to forward "false documents" to FCI Fairton to support this affirmation; and (4) moving the New York Supreme Court to issue a bench warrant for violating state parole, and directing Olga Sakelos to lodge the warrant as a detainer through a January 6, 1997 letter.  The Court will take these allegations to be true for purposes of determining the threshold question of immunity.  *See Kalina v. Fletcher*, 522 U.S. 118, 122 (1997) ("In determining immunity, we accept the allegations of respondent's complaint as true.").

Tomselli's actions do not fit squarely into either the administration of the district attorney's office or a decision to prosecute.  However, reading *Myers* to hold that ADAs are to be considered county official except for the narrow exception carved out by *Baez*, the Court finds that Tomaselli's actions were taken as a county official as opposed to a state officer.  *See also Walker*, 974 F.2d at 301 (citing *Gentile v. County of Suffolk*, 926 F.2d 142, 152 n.5 (2d Cir. 1991) ("In *Gentile*, we confined *Baez* to challenges to 'specific decision[s] of the District Attorney to prosecute.").  Therefore, Tomaselli may not claim Eleventh Amendment protection when sued in his official capacity.  The claims against Tomaselli in his official capacity based on these actions are properly analyzed as if the claims were brought against the City of New York itself.  *See Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988) ("Official capacity suits . . . are, in all respects other than name, suits against a governmental entity.").  Those claims are analyzed below in Section 2(b)(i).

b.     _Absolute Immunity_

When an official is sued for damages in his individual capacity, he may not claim Eleventh Amendment immunity.  *See Hafer v. Melo*, 502 U.S. 21, 31 (1991). Nonetheless, his actions as a prosecutor may be entitled to absolute immunity.  While absolute immunity may sometimes "leave the genuinely wronged defendant without civil redress," the Supreme Court found such immunity necessary to enable "the vigorous and fearless performance of the prosecutor's duty."  *Imbler v. Pachtman*, 424 U.S. 409, 428 (1976).  However, "[a]bsolute immunity . . . extends only so far as is necessary either to protect the prosecutor against retaliation and hindsight challenges with respect to his prosecutorial decisions or to guarantee the effective functioning of the judicial process." *Ying Jing Gan*, 996 F.2d at 530.  Tomaselli argues that he is absolutely immune from liability in his personal capacity because he was acting in his prosecutorial role.  (Defs.' Mem. 8–9.)  He bears the burden of showing that absolute immunity is justified for the function in question.  *Burns v. Reed*, 500 U.S. 478, 486 (1991).

Courts follow a functional analysis when determining whether a prosecutor is entitled to immunity, considering "the nature of the function performed, not the identity of the actor who performed it."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). Absolute prosecutorial immunity is broader than Eleventh Amendment immunity as discussed above, and extends beyond the decision of whether or not to prosecute.  In *Imbler*, the Court held that state prosecutors are entitled to absolute immunity to § 1983 claims for prosecutorial activities that are "intimately associated with the judicial phase of the criminal process, [including] initiating a prosecution and in presenting the state's case."  424 U.S. at 430–31.  Likewise, a prosecutor may claim absolute immunity when

acting as an advocate for the state. *Bernard v. County of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004). "Most other activities are characterized as administrative or investigative and, thus, merit less protection." *Fields v. Soloff*, 920 F.2d 1114, 1120 (2d Cir. 1990); *see also Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) ("[W]hen a prosecutor functions as an administrator or performs the investigative functions normally performed by a detective or police officer, he is eligible only for qualified immunity."); *Burns*, 500 U.S. at 486–87 ("The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.").[3] Once a court determines that a prosecutor's act is covered by absolute immunity, the motive behind that act becomes irrelevant. *Bernard*, 356 F.3d at 503. If a court determines that the prosecutor's activities were administrative or investigative, and thus not entitled to absolute immunity, the prosecutor is still entitled to qualified "good faith" or qualified immunity. *See Lee v. Willins*, 617 F.2d 320, 321–22 (2d Cir. 1980).

Tomaselli argues that he is absolutely immune to liability for each of the four activities described above because they were "litigation-related activities" or "concerned plaintiff's sentencing." (Defs.' Mem. 8–9.) The Court will consider each activity seriatim. First, plaintiff alleges Tomaselli directed Olga Sakelos to send the July 1, 1996 letter to FCI Fairton in order to avoid the requirements of the Interstate Agreement on Detainers. It may be argued that the removal of detainers is an administrative act. Indeed, the letter was sent by an "Extradition Specialist" and such activities are performed by the detainer unit at OSNP, not by assistant district attorneys. (Tomaselli

---

[3] Examples of administrative activities not covered by absolute immunity include personnel decisions, *see Forrester v. White*, 484 U.S. 219, 229 (1988), a failure to protect a witness, *see Ying Jing Gan*, 996 F.2d at 531, and prison transfers within the same penal system, *see Pinaud v. County of Suffolk*, 52 F.3d 1139, 1150 (2d Cir. 1995).

Dep. 11:24-12:03.)  However, plaintiff alleges that the letter was sent at Tomaselli's direction, and accepting for the moment that this allegation is true, the issue is whether Tomaselli was acting in a prosecutorial or administrative capacity.  There appears to be no direct authority addressing whether a decision to remove a detainer (or not to seek extradition) is subject to absolute immunity.  However, the affirmative decision to issue a detainer has been held to be protected by absolute immunity on the grounds that securing a prisoner for prosecution is a prosecutorial function.  *See Pinaud v. County of Suffolk*, 52 F.3d 1139, 1150 (2d Cir. 1995).  In slightly different circumstances, courts have held that the decision not to prosecute is subject to the same immunity as a decision to prosecute.  *See Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989) (because absolute immunity protects the decision to prosecute, "as a matter of logic, absolute immunity must also protect the prosecutor from damages suits based on his decision not to prosecute.").  By analogy, the concomitant decision to withdraw a detainer should be as protected as the prosecutor's initial decision to file one.  *See id.* (absolute immunity granted "to avoid establishing a doctrine that would 'discourage prosecutors from dismissing meritless actions before trial, since only by pursuing . . . charges would the prosecutor be fully immune'" (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1270 n. 200 (D.C. Cir. 1987))).  Therefore, the Court finds that Tomaselli's alleged role in the July 1, 1996 letter is subject to absolute immunity.

Plaintiff next alleges that Tomaselli filed an affirmation with the New York Supreme Court on October 17, 1996 requesting release of plaintiff to federal custody and

stating falsely that plaintiff had been sentenced in state court.[4]  Tomaselli relies on *Pinaud v. County of Suffolk* to argue that effectuating transfers among city, state, and federal facilities is always a prosecutorial function entitled to absolute immunity.  This is an overly broad reading of *Pinaud*, in which prosecutors had arranged to have the plaintiff transferred from a federal prison to a state jail to enable a state prosecution.  Since the transfer was directly related to the prisoner's prosecution, it was an act subject to absolute immunity.  Nevertheless, in other circumstances, "coordinating the transfer of a prisoner from one corrections facility to another in the same penal system is an administrative task for which only qualified immunity would be available."  *Pinaud*, 52 F.3d at 1150.  While plaintiff's October 1996 transfer was between state and federal prison, it was clearly not for the purpose of effectuating a prosecution or sentencing, but was instead at his request and at the direction of the state judge.  (Smith Decl. Ex. K 8:15–18.)  Plaintiff was to be transferred back to FCI Fairton, pending a return to state custody for the November 22, 1996 hearing, in order to continue the medical treatment he had received in federal custody.  This places Tomaselli's actions closer to an administrative function than a prosecutorial one.  (*Id.* at 3:19–4:2.)  Therefore, the Court finds that Tomaselli is not entitled to absolute immunity for his actions in submitting the October 17, 1996 affirmation.

Plaintiff's third allegation is that Tomaselli conspired with Dunnigan to have her forward false documents to FCI Fairton to resolve questions about his "false" affirmation raised by plaintiff to prison officials.  (Smith Decl. Ex. B. ¶ 28.)  On its face, the letter lodges a detainer with FCI Fairton requiring that plaintiff be returned to state custody

---

[4] Tomaselli's motive in filing this affirmation is irrelevant to the analysis of whether he is entitled to absolute immunity.  *Bernard*, 356 F.3d at 503.  Thus, it is of no consequence whether the mistake was based on a computer error or an oversight, or rather malice as alleged by plaintiff.

following his release from federal detention in order to serve out the remainder of his

state sentence.  (Smith Decl. Ex. J.)  The Court may not inquire into the alleged motives

behind this letter being sent, but looks only at its content.  As noted, the *lodging* of a

detainer—whether pending an indictment, to secure a prisoner for trial or sentencing, or

to facilitate the completion of a state sentence—is covered by absolute immunity.  *See*

*Dickerson v. Kemp*, 540 So. 2d 467, 470 (La. Ct. App. 1989) (cited in *Pinaud*, 52 F.3d at

1150 n.7) (decision to issue detainer pending indictment covered by absolute immunity);

*Pinaud*, 52 F.3d at 1150 ("mechanisms for securing a prisoner's availability for

prosecution" covered by absolute immunity); *Taylor v. Kavanagh*, 640 F.2d 450, 451–52

(2d Cir. 1981) (prosecutor's role in sentencing proceeding covered by absolute

immunity); *Hrubec v. City of New York*, No. 93 Civ. 8367 (SS), 1995 U.S. Dist. LEXIS

10029, 1995 WL 422023, at *3 (S.D.N.Y. July 18, 1995) (absolute immunity extends

beyond sentencing to statements made by prosecutor to parole board).  Therefore, any

role of Tomaselli in having Dunnigan send this letter and any attached sentencing

information is covered by absolute immunity.

Finally, plaintiff alleges that Tomaselli falsely obtained a bench warrant and had

his office lodge it as a detainer with FCI Fairton.  The purpose of this warrant and

detainer, as made clear in the January 6, 1997 letter from Sakelos, was to sentence the

plaintiff.  (Jakabovics Decl. Ex. G.)  Tomaselli correctly argues that these alleged actions

are entitled to absolute immunity.  First, prosecutors are entitled to absolute immunity

"based on their actions in procuring [plaintiff's] arrest warrant."  *Barr v. Abrams*, 810

F.2d 358, 362 (2d Cir. 1987); *see also Kalina*, 522 U.S. at 129 (holding that prosecutor's

"activities in connection with the preparation and filing of . . . an arrest warrant . . . are

protected by absolute immunity.").  Second, the Second Circuit has stated that "mechanisms for securing a prisoner's availability for prosecution . . . are covered by absolute immunity." *Pinaud*, 52 F.3d at 1150.   Although the actions in this case were taken to secure the prisoner's availability for sentencing, rather than for prosecution, this does not alter the immunity analysis.  Conduct during sentencing proceedings, like conduct during prosecutions, is covered by absolute immunity.  *See Taylor*, 640 F.2d 450 at 451–52.  Therefore, these alleged actions are also covered by absolute immunity.

      c.      *Qualified Immunity*

Inasmuch as the Court has concluded that Tomaselli's filing of an arguably incorrect affirmation in connection with plaintiff's transwer to federal custody is not protected by absolute immunity, the question remains whether Tomaselli is entitled to qualified immunity.  *See Day v. Morgenthau*, 909 F.2d 75, 77 (2d Cir. 1990) (prosecutor's actions falling outside scope of absolute immunity may still be entitled to qualified immunity).  The doctrine of qualified immunity shields state officials from personal liability if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This requires a two-step inquiry: first, the Court examines whether the plaintiff's factual allegations "show the [official's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If plaintiff cannot raise a genuine issue of material fact that such a violation occurred, then defendant is entitled to summary judgment.[5]  Second, if plaintiff can show defendant

---

[5] This inquiry is analogous to consideration of the merits of plaintiff's claim against defendant, and requires determining whether there was a constitutional injury and whether such injury was caused by defendant. *Cf. Carey v. Piphus*, 435 U.S. 247, 257 (1978) ("set of rules" developed by "the common law of torts . . . provide[s] the appropriate starting point for the inquiry under § 1983").

violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established," *id.*, and, if so, whether it was objectively reasonable for the defendant to believe his or her acts did not violate plaintiff's rights.  *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996).  If either the right was not clearly established, or it was objectively reasonable for the defendant to believe the acts did not violate plaintiff's rights, the defendant is entitled to qualified immunity.  The Court now turns to the initial inquiry.

Plaintiff alleges that defendant Tomaselli violated his constitutional rights by: (1) intentionally taking actions to "induce continued confinement"; (2) "deliberately and maliciously continu[ing] to prosecute the Plaintiff"; and (3) failing to take "reasonable steps to ascertain if [plaintiff] was properly being prosecuted and detained."  (Am. Compl. ¶¶ 22, 23, 31, 32.)[6]  The Court will examine whether Tomaselli's filing of the misleading affirmation, the only action not covered by absolute immunity, violated any of plaintiff's constitutional rights.

i.    Continued Confinement

Plaintiff's claim of improper confinement sounds in the Eighth Amendment and the Due Process Clause as applied to states through the Fourteenth Amendment.  As found by Judge Patterson, had plaintiff been given credit by NYS DOCS for his federal sentence as intended by Justice Shea, his properly calculated date of release upon expiration of his maximum sentence would have been August 12, 2000.  *Peterson I*, 1998 WL 883302, at *5.  Moreover, plaintiff's conditional release date (again assuming a

---

[6] Plaintiff further alleges that Tomaselli was "negligent, careless and reckless" in his performance of his duties and confinement of plaintiff.  (Am. Compl. ¶ 35.)  However, the Supreme Court has clearly held that negligent conduct is insufficient as a matter of law to establish a constitutional violation.  *Daniels v. Williams*, 474 U.S. 327, 332–33 (1986).

concurrent sentence) would have been April 12, 1998.  *Id.*  While parole rests "in the discretion of the state board of parole," N.Y. Penal Law § 70.40, conditional release from an indeterminate sentence is "a form of automatic parole."  N.Y. Penal Law § 70.40 Practice Commentary at 382.  The Penal Law states that a person serving an indeterminate sentence "shall," upon request, be conditionally released when the total good behavior time is equal to the unserved portion of his maximum term.  *Id.* § 70.40(b).  Good behavior time is governed by N.Y. Correction Law § 803 and may total one-third of the maximum term imposed by the court.  Because NYS DOCS did not give plaintiff credit for his time in federal detention, his conditional release date was (mis)calculated to be May 7, 2000.  Therefore, by the time plaintiff was released in connection with his habeas petition, he had been kept in prison for eight months beyond his properly calculated conditional release date.

Plaintiff's continued confinement does not appear to give rise to an Eighth Amendment violation.  At least one Circuit has explicitly held that detention beyond the expiration of a term of *maximum* imprisonment violates the Eighth Amendment.  *See Sample v. Diecks*, 885 F.2d 1099, 1108 (3rd Cir. 1989); *Calhoun v. N.Y. State Div. of Parole Officers*, 999 F.2d 647 (1993) (citing *Sample* in evaluating Eighth Amendment claim, but finding that detention for five days beyond expiration of maximum sentence did not rise to constitutional violation).  However, the Court is not presented with that case here.  Instead, plaintiff was held beyond his conditional release date but released before the properly calculated conclusion of his maximum sentence of August 12, 2000.  New York's conditional release statute creates a liberty interest subject to due process protections, *see infra*, but it is unclear how this affects an Eighth Amendment claim for

being held beyond one's conditional release date.  On the one hand, it may be argued that it is not "cruel and unusual" to hold a prisoner for up to his or her maximum sentence, unless that sentence is grossly disproportionate to the crime committed.  *See Ewing v. California*, 538 U.S. 11, 23 (2003) ("Eighth Amendment . . . forbids only extreme sentences that are grossly disproportionate to the crime.") (internal quotation marks omitted).  On the other hand, if a state has chosen to create an enforceable liberty interest in a given release date, then why should detention past that date be treated differently than detention past the expiration of a maximum sentence?  *Cf. Rummel v. Estelle*, 445 U.S. 263, 280–81 (1971) (considering parole and not merely maximum sentence in evaluating constitutionality of sentence under Eighth Amendment).

However, the Court need not answer this question because plaintiff's claim premised upon an Eighth Amendment violation fails for other reasons.  Even assuming that being released after the expiration of a state-created conditional release date but before the expiration of a maximum sentence constitutes an Eighth Amendment violation, plaintiff cannot establish the essential elements of a § 1983 claim against Tomaselli arising out of this constitutional violation:

> [P]laintiff first must demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be inflicted.  Second, the plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight.  Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the infliction of the unjustified detention.

*Sample*, 885 F.2d at 1110.  As to the first element, when Tomaselli filed the October 17, 1996 affirmation, he had no knowledge that unwarranted punishment would be inflicted.

Indeed, as stated in his affirmation dated October 31, 1996, Tomaselli believed that plaintiff's eventual state sentence "will be running concurrent with his Federal sentence, on a *nunc pro tunc* basis." (Jakabovics Decl. Ex. D.)  Second, because Tomaselli reasonably believed that plaintiff would receive credit for serving his federal sentence, his response to the problem can hardly be characterized as "a product of deliberate indifference to [Peterson's] plight."  *Sample*, 885 F.2d at 1110.  At most, plaintiff has raised a genuine issue as to whether Tomaselli was negligent in submitting the affirmation with misleading sentencing information, but negligent conduct is insufficient as a matter of law to establish a constitutional violation.  *Daniels v. Williams*, 474 U.S. 327, 332–33 (1986) ("Where a government official's act causing injury to life, liberty, or property is merely negligent, 'no procedure for compensation is *constitutionally* required." (quoting *Parratt v. Taylor*, 451 U.S. 527, 548 (1981) (Powell, J., concurring))).

Finally, plaintiff has not established a causal connection between any of Tomaselli's alleged actions and plaintiff's extended incarceration.  Tomaselli's October 17, 1996 affirmation to the court requesting that plaintiff be returned to federal custody is the only action not covered by absolute immunity.  Plaintiff's argument that this perhaps misleading affirmation resulted in plaintiff's imprisonment being extended is a breathtaking leap of logic.  Both Tomaselli and Justice Shea believed that plaintiff's eventual state sentence, whenever imposed, would run concurrently with his federal sentence on a *nunc pro tunc* basis from his first day in federal custody.  In reality, plaintiff's extended incarceration was entirely unrelated to the October 17, 1996 affirmation, but was instead caused either by the failure of the sentencing and "commitment papers [] to definitively indicate that the defendant should receive[] credit"

for time served in federal custody (Letter of Ass't Att'y General Efrem Z. Fischer to

Judge Patterson, December 21, 1998, Ex. D), or alternately, by the miscalculation by

NYS DOCS of plaintiff's sentence based on his ambiguous commitment papers, *see*

*Peterson I*, 1998 WL 883302, at *5–*6.  Neither error was the foreseeable result of any

of Tomaselli's actions, and certainly not the October 17, 1996 affirmation.[7]  Therefore,

the Court concludes that the claim against Tomaselli based on an alleged Eighth

Amendment violation must fail.

Peterson's § 1983 claim against Tomaselli based on an alleged due process

violation is also flawed in several respects.  "To award damages under 42 U.S.C. § 1983

for an alleged violation of procedural due process, a court must find that, as the result of

conduct performed under color of state law, the plaintiff was deprived of life, liberty, or

property without due process of law."  *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir.

1996).  The most basic aspect of liberty is the freedom from bodily restraint, and the

Second Circuit has found that inmates have a "liberty interest in being released upon the

expiration of [their] *maximum* term of imprisonment."  *Calhoun*, 999 F.2d at 653

(emphasis added).  While plaintiff was not held beyond the expiration of his maximum

term of imprisonment, and a "convicted person has 'no constitutional or inherent right . . .

---

[7] The Supreme Court has held that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions."  *Monroe v. Pape*, 365 U.S. 167, 187 (1961).  In the language of tort liability, these errors were superseding causes.  *See Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1996) ("In cases brought under § 1983 a superseding cause, as traditionally understood in common law tort doctrine, will relieve a defendant of liability."); *see also Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999) (trial judge's erroneous decision not to suppress unlawfully seized evidence was a superseding cause and precluded liability of initial actor for plaintiff's conviction); *Duncan v. Nelson*, 466 F.2d 939, 943 (7th Cir. 1972) (sentencing, as "discretionary function," was superseding cause precluding liability of initial actor for plaintiff's sentence).  A superseding cause does not absolve an actor from liability if the injury results from a third party's actions that are reasonably foreseeable.  *See Warner*, 115 F.3d at 1071.  However, it was not reasonably foreseeable that Tomaselli's actions, even as alleged by plaintiff, would cause plaintiff to be incarcerated for too long; indeed, Tomaselli and the sentencing judge agreed that the delay in sentencing would not cause plaintiff any harm.  Peterson I, 1998 WL 883302, at *3; (Jakabovics Decl. Ex. D.)

to be conditionally released before the expiration of a valid sentence,' . . . a State may create legitimate expectations that are entitled to procedural protection under the Due Process Clause of the Fourteenth Amendment." *Rummel v. Estelle*, 445 U.S. 263, 293–94 (1980) (Powell, J., dissenting) (quoting *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7 (1979)); *see Sandin v. Conner*, 515 U.S. 472, 483–84 (1995) ("States may under certain circumstances create liberty interests which are protected by the Due Process Clause."). The Court in *Greenholtz*, after finding that the mandatory language in Nebraska's parole statute created an expectancy of release, instructed that "whether any other state [parole] statute provides a protectible entitlement must be decided on a case-by-case basis." 442 U.S. at 12.

As noted earlier, New York Penal Law provides that a person serving an indeterminate sentence "shall," upon request, be conditionally released when the total good behavior time is equal to the unserved portion of his term. N.Y. Penal Law § 70.40(1)(b); *see Greenholtz*, 442 U.S. at 11–12 (finding that the use of the word "shall" in a parole statute can create legitimate expectations). The Second Circuit, on appeal from a case finding no liberty interest created by § 70.40(1)(b),[8] chose not to "reach the thorny question of whether a liberty interest existed here." *Doe v. Simon*, 221 F.3d 137, 139 (2d Cir. 2000); *see also Rosemond v. Menifee*, 137 F. Supp. 2d 270, 274 (S.D.N.Y.

---

[8] The district court's conclusion that no liberty interest is created by § 70.40(1)(b) is unpersuasive. *Doe v. Simon*, No. 96 Civ. 3482 (JSM), 1999 U.S. Dist. LEXIS 13223, 1999 WL 672999 (S.D.N.Y. Aug. 27, 1999). First, the court relied on *Greenholtz* for the proposition that plaintiff had no liberty interest in being released before his maximum release date, although *Greenholtz* specifically found the Nebraska parole statute to have created a protected liberty interest. 442 U.S. at 11–12. *Greenholtz* asks the question of whether the state created a liberty interest in early release, it does not answer it. Second, the court suggests that *Sandin* precludes a state-created liberty interest in early release because deprivation of early release does not "exceed[] the sentence in such an unexpected manner." *Sandin*, 515 U.S. at 483. While courts have had difficulty determining exactly which conditions "impose[] atypical and significant hardship on the inmate," *Sandin*, 515 U.S. at 483–84, and thus may be the subject of a state-created liberty interest, certainly actual release from prison is the type of interest, indeed the fundamental liberty interest, that is protected by the due process clause.

2000) ("[W]hether Penal Law § 70.40(1)(b) creates a constitutionally protected liberty interest in conditional release remains an open question in this Circuit.")  Assuming, arguendo, that New York has created a legitimate expectation that inmates would be released upon their automatic conditional release date, the Court concludes that plaintiff was afforded adequate due process.

"When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees."  *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 880 (2d Cir. 1996) (citations omitted).  "Under the latter scenario, a deprivation effectuated through the random and unauthorized acts of government officials does not violate procedural due process so long as the government provides a meaningful remedy subsequent to deprivation."  *Locurto v. Safir*, 264 F.3d 154, 172 (2d Cir. 2001).[9]  Plaintiff's allegations against Tomaselli clearly involve his "random and unauthorized acts," and not a flawed state procedure.  Therefore, plaintiff has the burden of demonstrating that no meaningful remedy was available subsequent to his liberty deprivation.  This he cannot do.

Plaintiff could have initiated either an Article 78 proceeding or a state habeas proceeding to adjudicate his claim regarding his release date.  *Cf. Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 881 (holding that Article 78 proceeding was an adequate postdeprivation remedy for random and arbitrary debarment from city procurements); *Marino v. Ameruso*, 837 F.2d 45, 47 (2d Cir.1988) (finding that Article

---

[9] "The rationale for this principle is plain: because the challenged misconduct is random and unauthorized, it is impossible for the government to anticipate and prevent the wrongful loss of liberty or property in advance, and it has no realistic alternative other than to adopt remedies capable of righting the wrong after deprivation."  *Locurto*, 264 F.3d at 172.

78 proceeding was an adequate postdeprivation remedy for random and unauthorized evidentiary ruling by administrative law judge that resulted in termination of public employment); *see also Schultz v. Egan*, 103 Fed. Appx. 437, 441 (2d. Cir. 2004) (unpublished opinion) (when "random and unauthorized" acts result in a prisoner being held beyond his *maximum* release date, "the availability of an Article 78 proceeding or a habeas proceeding would almost certainly suffice to satisfy the due process clause.").  It is immaterial that plaintiff chose not to pursue his claims in either forum, *see Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984) (plaintiff is "not deprived of due process simply because he failed to avail himself of the opportunity"), or that he could not recover the same relief as in a § 1983 action, *see Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 881 ("An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit." (citing *Hudson v. Palmer*, 468 U.S. 517, 535 (1984))).

   Furthermore, for the reasons previously stated, even if plaintiff did not have an adequate post-deprivation remedy, he would still be unable to show that any of *Tomaselli's* actions actually violated his liberty interest in being released upon his conditional release date.  None of Tomaselli's alleged misconduct, let alone the one action not subject to absolute immunity, caused his extended incarceration.  In the absence of causation, there can be no § 1983 liability.  *See Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998) ("[I]n all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."); *Loria v. Gorman*, 306 F.3d 1271, 1287 (2d Cir. 2002) (same).

ii.   <u>Malicious Prosecution</u>

A claim for malicious prosecution is actionable under § 1983.  *See Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994).  To state a claim for malicious prosecution, plaintiff must show that defendant's conduct was tortious under state law and resulted in a constitutionally cognizable deprivation of liberty.  *See Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003).  This requires plaintiff to show: (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice.  *See Colon v. City of New York*, 455 N.E.2d 1248 (N.Y. 1983).  Even if all of plaintiff's allegations are accepted as true, he still cannot sustain a malicious prosecution claim.[10]

While the sentencing process took three-and-a-half years, the criminal proceeding was never terminated in plaintiff's favor.  A proceeding has terminated in plaintiff's favor where "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus."  *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).  While it is true that a writ of habeas corpus was issued by Judge Patterson, the Second Circuit has declined to find a final determination in favor of the accused whenever a writ issues.  *DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996).  Instead, and consistent with the reasoning in *Heck*, the Second Circuit requires that the writ be considered an "indication of

---

[10] In addition to failing to satisfy the elements of a malicious prosecution claim against Tomaselli, plaintiff's claim is also barred by prosecutorial immunity.  Tomaselli is protected by absolute immunity for any role he played in the decision to prosecute plaintiff and for his role in pursuing that prosecution.  *See Imbler*, 424 U.S. at 430–31 (state prosecutors are entitled to absolute immunity for "initiating a prosecution and in presenting the state's case.").

innocence." *Id.*; *see Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980)

("Proceedings are 'terminated in favor of the accused' only when their final disposition is

such as to indicate the accused is not guilty.").  The issuance of the writ in *Peterson I* did

not indicate that plaintiff was innocent, but only that he had been imprisoned beyond his

conditional release date.  Such a writ is not a termination in favor of the accused.

Moreover, plaintiff presents no evidence, beyond a conclusory statement (Am. Compl.

¶ 31), that Tomaselli lacked probable cause for the proceeding against him.  He had

already entered a plea of guilty, admitting to criminal sale and possession of controlled

substance in the third degree, and only sentencing remained.  Therefore, he cannot sustain

a § 1983 claim against Tomaselli for malicious prosecution.

iii.    <u>Deliberate Indifference</u>

Finally, plaintiff alleges Tomaselli failed to take adequate steps to ensure plaintiff

was being properly detained.  A § 1983 cause of action can rest on a showing of

"deliberate indifference . . . by failing to act on information indicating that

unconstitutional acts were occurring."  *Colon*, 58 F.3d at 873.  This requires a showing

that the defendant "intended the discrimination to occur" or acted "clearly unreasonably

in light of the known circumstances" by failing to act to prevent the constitutional injury.

*Back*, 365 F.3d at 127 (quotations omitted).  Plaintiff fails to set forth specific facts

supporting this theory sufficient to create a genuine issue for trial.  Plaintiff does not

explain what Tomaselli knew about his incarceration and when.  It was not until (1)

Justice Shea sentenced plaintiff without explicitly stating that the sentence was to be

imposed *nunc pro tunc*, and (2) NYS DOCS miscalculated his sentence that his

impending constitutional injuries became foreseeable, and it was not until April 1998 that

31

his constitutional injuries began.  Plaintiff fails to offer any evidence showing that Tomaselli's actions as of those dates were clearly unreasonable in light of what he knew. In the absence of such a showing, Tomaselli is entitled to summary judgment as to this claim.

Based on the foregoing analysis, the Court finds that plaintiff has failed to show that Tomaselli's actions violated any of plaintiff's constitutional rights and Tomaselli is entitled to qualified immunity for all of his conduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Thus, it is unnecessary to reach the final steps in the qualified immunity analysis: whether plaintiff's rights were clearly established and, if so, whether it was objectively reasonable for Tomaselli to believe his actions did not violate plaintiff's rights.  *Id.*

**2.**  **Claims Against Other Defendants**

a.  *Commissioner of the NYC DOC*

In deciding the Rule 12(b)(6) motion previously filed in this action, the Court examined all the methods by which plaintiff could demonstrate personal involvement of the Commissioner of the Department of Corrections in a deprivation of plaintiff's rights. *Peterson III*, 2004 WL 2211651, at *6–*8.  While the Court determined that plaintiff had failed to adequately allege conduct giving rise to the Commissioner's liability, we allowed individual claims against the Commissioner to proceed in part because plaintiff was proceeding *pro se* and in part because discovery into the actions of supervisory officials can reveal subordinate officials who may have personal liability.  *Id.* at *8. Plaintiff has now retained a lawyer, had an opportunity to conduct discovery, and amended his complaint.

Nonetheless, the amended complaint still fails to state a cause of action against the Commissioner upon which relief can be granted.  It does not make any allegations affirmatively linking plaintiff's injuries with the Commissioner's conduct.  Nor does the plaintiff point to any such evidence in opposing this motion.  As discussed in detail in the previous opinion, *id.* at *6, an individual can be held liable for damages under § 1983 only by showing personal involvement by the individual in the alleged deprivation of plaintiff's rights.  *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004); *Mandala v. Coughlin*, 920 F. Supp. 342, 350-51 (E.D.N.Y. 1996) (dismissing complaint against Commissioner of NYS DOCS after plaintiff failed to establish any personal responsibility for alleged injuries).  Therefore, this Court is compelled to dismiss the complaint against the Commissioner.  *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998) (summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case").

      b.     *City of New York*

In order for a governmental entity to be held liable, the plaintiff must show that an identified municipal practice or policy was the "moving force [behind] the constitutional violation." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978); *see Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the City. . . .  The mere invocation of [a] pattern or plan [will] not suffice without this causal link." (citations and internal quotation marks omitted)).  A municipality will not be held liable solely because of the misconduct of non-supervisory employees.  *See Monell*, 436 U.S. at 691 (rejecting *respondeat superior* liability in §

1983 actions).  However, even single actions of an official with final policymaking
authority regarding the alleged constitutional deprivation can give rise to liability.  *See*
*Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986).  Alternatively, a plaintiff can base
municipal liability on a "failure to train amount[ing] to deliberate indifference to the
rights of those with whom municipal employees will come in contact."  *City of Canton v.*
*Harris*, 489 U.S. 378, 388 (1989).

Plaintiff does not identify any municipal policy, custom, or practice that caused a
violation of his federal rights, much less set forth specific facts raising a genuine issue for
trial.  Nor does he allege a failure to train city employees sufficient to give rise to
municipal liability.  Therefore, any claim of municipal liability must rest on the specific
actions of an official with final policymaking authority.  *See Barett v. Orange County*
*Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) (where injuries complained of
are solely attributable to actions of named defendants, municipal liability cannot exist in
the absence of individual liability).

In *Peterson III*, the Court examined in detail plaintiff's proposed claims against
the City based on the conduct of Tomaselli and the Commissioner of NYC DOC.  2004
WL 2211651, at *8–*11.  After doing so, the Court denied plaintiff leave to amend the
complaint to add the City as a defendant, but stated that it would entertain a further
motion to amend should the plaintiff be able to allege with greater specificity a factual
basis for this claim.  *Id.*, at *11.  No motion was ever presented to the court and although
an amended complaint was filed purporting to name the City as defendant, the
amendment is wholly ineffective in the absence of leave from the Court.  Fed. R. Civ. P.
15(a) ("[P]arty may amend . . . only by leave of court.").  Nevertheless, in opposing

summary judgment, plaintiff contends that the City is liable based on the actions of Tomaselli.[11]  Assuming, arguendo, that plaintiff had properly and successfully moved to amend the complaint, the claims against the City would still fail.

Plaintiff repeatedly points out that Tomaselli supervised fifteen to twenty lawyers during his tenure as a bureau chief at the OSNP, and argues on this basis that he was a policymaker for the office.  Whether an official has final policymaking authority is a question to be decided by the court.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  The determination is "dependent on the definition of the official's functions under relevant state law."  *McMillian v. Monroe County, Alabama*, 520 U.S. 781, 786 (1997).  With respect to district attorneys, only where they act as county officials, as opposed to state officials, can they provide a basis for municipal liability.  *See Myers*, 157 F.3d at 76.  The Court examined the alleged misconduct of Tomaselli, *see supra*, and determined that all of his acts were taken in the role of a county official.  However, "[o]nly actions by officials relatively high up in the municipal hierarchy will produce municipal liability."  *Walker*, 974 F.2d at 297; *see Pembaur*, 475 U.S. at 483 (municipal liability attaches only where "a deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question.").  The Second Circuit has elaborated on the inquiry into whether an official is a final policymaker: "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions."  *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003).

---

[11] Plaintiff has presented no additional evidence, nor made any new arguments, to support a claim against the City based on the Commissioner's actions.

While Tomaselli was a bureau chief at OSNP during the relevant time period, plaintiff has offered no evidence that he, as opposed to the Special Prosecutor in charge of the OSNP, had any policymaking role in the office, or more importantly, that the actions he undertook in plaintiff's prosecution were undertaken in his capacity as a supervisor.  Indeed, it is evident that they were not.  Activities such as negotiating plea agreements, scheduling hearings, and filing affirmations in support of writs are typically actions of assistant district attorneys undertaken in the prosecution of a criminal case. Such actions cannot be said to represent the actions of a policymaker responsible for a delineated policy that caused a constitutional deprivation.  *Peterson III*, 2004 WL 2211651, at *10 (citing *Belot v. Wieshaupt*, No. 96 Civ. 3005 (SS), 1997 U.S. Dist. LEXIS 5772, 1997 WL 218449, at *8 (S.D.N.Y. April 29, 1997).  To hold otherwise would tread too closely to holding the municipality liable on a theory of *respondeat superior.  See Sorlucco v. New York City Police Dep't*, 971 F.2d 94, 100 (2d Cir. 1993) (municipality "may not be held liable under § 1983 for the isolated unconstitutional acts of its employees").  Therefore, the court grants summary judgment as to plaintiff's claim of municipal liability based on Tomaselli's actions.

      c.     <u>*Other Defendants*</u>

This Court previously granted plaintiff leave to amend his complaint to add as "John Doe" defendants unidentified employees of the NYC DOC and Office of the Special Narcotics Prosecutor, which he has done.  *Peterson III*, 2004 WL 2211651, at *5. This allowed the plaintiff to conduct further discovery to identify the employees responsible for his injuries.  Discovery has now been completed and plaintiff has not identified any additional defendants who may be liable for the deprivation of his federal

rights.  Nor does he assert that additional discovery or trial will reveal these defendants'

identity.  It is a general principle of tort law that a "tort victim who cannot identify the

tortfeasor cannot bring suit."  *Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir. 1996).  Since

plaintiff is seeking monetary damages from defendants in their personal capacity, he

cannot recover from anonymous defendants.  *See Carey v. Piphus*, 435 U.S. 247, 257

(1978) ("set of rules" developed in "common law of torts" governs "damages awards

under § 1983").  Therefore, it is appropriate at this stage to grant summary judgment as to

plaintiff's claims against unnamed defendants.

**3.     State Law Claims**

          As a condition precedent to bringing an action against a New York municipality

or its employees, a potential plaintiff must file a notice of claim within ninety days after

the claim arises.  N.Y. Gen. Mun. Law § 50-e(1)(a) (McKinney 1999).  Failure to comply

with the notice of claim provision ordinarily requires dismissal of state claims.  *Davidson*

*v. Bronx Mun. Hosp.*, 473 N.E.2d 761, 762 (N.Y. 1984).[12]  Plaintiff alleges violations of

New York Judiciary Law § 487 against Tomaselli and the City of New York.  However,

he has not filed a notice of claim, nor did he ever apply for an extension in the period

allowed.  *See Pierson v. City of New York*, 439 N.E.2d 331, 332 (N.Y. 1982) (requiring

application for discretionary extension be made within one year and ninety days after

cause of action accrued).  No basis for tolling exists.  In his opposition brief, plaintiff

advances no reason why justice requires allowing his state claims to proceed despite the

---

[12] The notice of claim requirement is not applicable to federal claims under § 1983.  *See Felder v. Casey*, 487 U.S. 131, 138–40 (1988) (noting "near-unanimous conclusion" of lower federal courts that state notice of claim provisions are inapplicable to § 1983 actions brought in federal court); *Ahern v. Neve*, 285 F. Supp. 2d 317, 321 (E.D.N.Y. 2003) ("While the notice of claims requirement applies to state-based claims, it does not apply to actions brought pursuant to § 1983.").

failure to timely file a notice of claim. Therefore, the Court dismisses with prejudice the state claims against both Tomaselli and the City of New York.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [58] is granted. Plaintiff's amended complaint [50] is dismissed in its entirety. The Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: New York, New York
January 16, 2007

Richard J. Holwell
United States District Judge